**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**Southern Division**

| | |
|---|---|
| GCI Outdoor, Inc., | |
| Plaintiff and Counter-Defendant, | Civil Action No.: 1:20-cv-00367-PLM-PJG<br>Hon. Paul L. Maloney |
| v. | |
| Wholesale Merchandisers LLC, and<br>Zhejiang Pride Leisure Product, | |
| Defendants and Counterclaimants. | November 18, 2021 |

**PLAINTIFF GCI OUTDOOR, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. FACTUAL BACKGROUND ........ 2

A. Plaintiff GCI Outdoor, Inc. ........ 2

B. Procedural History ........ 3

C. General Overview of GCI's Patented Technology ........ 3

D. The Asserted '611 Patent ........ 4

E. The Level of Ordinary Skill in the Art ........ 7

III. LEGAL STANDARDS ........ 7

IV. GCI'S PROPOSED CLAIM CONSTRUCTION OF DISPUTED TERMS ........ 11

A. "rocker mechanism" (claims 1 and 15) ........ 12

B. "a sleeve" (claims 4-5 and 16-17) ........ 15

V. CONCLUSION ........ 18




47859986v.1

## TABLE OF AUTHORITIES

***Cases***


Atmel Corp. v. Information Storage Devices, Inc., 198 F.3d 1374 (Fed. Cir. 1999) .. 11, 12

Aventis Pharm. Inc. v. Amino Chemicals Ltd., 715 F.3d 1363 (Fed. Cir. 2013) ........ 10, 15

Budde v. Harley-Davidson, Inc., 250 F.3d 1369 (Fed. Cir. 2001) .................................... 13

CAE Screenplates v. Heinrich Fiedler GmbH, 224 F.3d 1308 (Fed. Cir. 2000) ............... 10

Callicrate v. Wadsworth Mfg., Inc., 427 F.3d 1361 (Fed. Cir. 2005)................................ 14

CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359 (Fed. Cir. 2002) ............................. 9

Immunex Corp. v. Sanofi-Aventis U.S., LLC, 977 F.3d 1212 (Fed Cir 2020) ................. 10

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111 (Fed. Cir. 2004) .......... 7

Markman v. Westview Instruments, 517 U.S. 370 (1996) ............................................. 7, 8

Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313 (Fed. Cir. 2005)................................. 9

Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250 (Fed. Cir. 1999) ............... 13

Middleton, Inc. v. Minnesota Mining & Manufacturing Co., 311 F.3d 1384 (Fed. Cir. 2002) .......... 8

Nazomi Comm., Inc. v. Arm Holdings, PLC, 403 F.3d 1364 (Fed. Cir. 2005)................... 8

Philips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) ....................................... 7, 8, 9, 10

Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc., 711 F.3d 1348 (Fed. Cir. 2013) .......... 8

Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831 (2015) .......................................... 7

Thorner v. Sony Comput. Entm't Am. LLC, 669 F.3d 1362 (Fed. Cir. 2012)................ 8, 9

Toshiba Corp. v. Imation Corp., 681 F.3d 1358 (Fed. Cir. 2012) ...................................... 9

Uniloc 2017 LLC v. Apple Inc., 996 F.3d 1368 (Fed. Cir. 2021) .................................... 10

Wenger Mfg., Inc. v. Coating Mach. Sys., Inc., 239 F.3d 1225 (Fed. Cir. 2001) ............. 13

Wi-Lan, Inc. v. Apple, Inc., 811 F.3d 455 (Fed. Cir. 2016) ....................10

***Statutes***

35 U.S.C. § 112, ¶ 2 ....................7

35 U.S.C. § 112(f) ....................10, 12

35 U.S.C. § 271 ....................3

***Other Authorities***

MPEP § 2181(I) ....................11

## I. INTRODUCTION

Plaintiff GCI Outdoor, Inc. ("GCI") hereby submits its opening Claim Construction Brief pursuant to the Case Management Order [ECF No. 17].

Four claim terms from one patent are being presented for construction by the Court. The terms proposed for construction appear in Asserted Claims 1-5, 8, 11, 13-17 and 19 of U.S. Patent No. 9,060,611 (hereinafter "the '611 Patent", a copy attached hereto as Exhibit A). The Parties exchanged proposed claim terms pursuant to the Case Management Plan [ECF No. 17], negotiated over the identified claim terms, and have identified four terms as requiring construction by the Court.

Upon agreement by the Parties, and as presented in the Parties' Joint Claim Construction Statement [ECF No. 41], Plaintiff GCI addresses two terms and Defendants address two terms in their respective opening briefs, as follows.

Plaintiff GCI shall brief its construction of the following terms and phrases in Plaintiff's opening claim construction brief:

- "*rocker mechanism*" ('611 Patent, claims 1, 3-5, 8, 15-17, 19); and
- "*a sleeve*" ('611 Patent, claims 4-5 and 16-17)

Defendants shall brief their construction of the following terms and phrases in Defendants' opening claim construction brief:

- "*associated with*" ('611 Patent, claims 5, 14, 17)
- "*frame side assembly*" ('611 Patent, claims 1-5 8, 11, 13-14, 16-17, 19)

Each Party shall address the opposing Party's terms in the responsive Claim Construction Briefs due by December 17, 2021.

## II. FACTUAL BACKGROUND

### A. <u>Plaintiff GCI Outdoor, Inc.</u>

In the summer of 2011, inventor Daniel Grace posed a question: why isn't there a portable, foldable chair for outdoor use that has a rocking action? Although answering that question would take Mr. Grace about 18 months of research, designing and redesigning, and a bit of failing, the results would pay off. By the end of 2012, Mr. Grace's company, Plaintiff GCI Outdoor, Inc., had a fully functional portable, collapsible rocking chair unlike anything on the market at the time. That product, GCI's FREESTYLE ROCKER®, the first in a line of more than half-a-dozen portable, collapsible rockers, would propel GCI's Connecticut-based business to new heights. By 2019, sales of GCI's rockers represented a nearly 400% increase over GCI's total sales revenue – for *all* GCI products – for 2013, when the rockers were first introduced. In 2020, the sales of those rockers accounted for more than 65% of GCI's overall business. These products are GCI's "lifeblood" and "vital" to its business and future success.

Small wonder, then, that GCI applied for patent protection for Mr. Grace's unique rockers in October 2012. That original application matured into the patent at issue here: the '611 Patent (Exh. A). GCI brought the present Action to enforce its patent rights and protect its valuable intellectual property from unfair competition and blatant knock-offs.

Plaintiff GCI epitomizes the sort of American-based company that the Patent Laws were meant to protect. Based in Higganum, Connecticut, GCI designs innovative outdoor products that are sold throughout the world by more than 250 retailers in more than 3,000 stores. GCI owns over 20 United States patents and prides itself on its commitment to innovation. Its innovation and continued substantial investments in the United States have propelled GCI to one of the outdoor industry's leading innovators of outdoor recreational gear.

GCI's accomplishments have been remarkable, and its technology and innovations are key to its success.

### B. Procedural History

The present Action has been brought against two Defendants: (i) Wholesale Merchandisers LLC ("Wholesale Merchandisers"), which imports, markets and sells a portable, collapsible rocking chair that infringes the '611 Patent (the Glide Zone Rocker Chair); and (ii) Zhejiang Pride Leisure Product ("Zhejiang"), which manufactures the Glide Zone Rocker Chair in China for importation and sale to Wholesale Merchandisers.

On August 16, 2019, GCI filed a Complaint under 35 U.S.C. § 271 against Defendant Wholesale Merchandisers alleging infringement of the '611 Patent. [ECF No. 1]. An Amended Complaint was filed on December 21, 2020 adding Zhejiang as a Defendant. [ECF No. 22]. GCI's allegations show that Wholesale Merchandisers and Zhejiang each infringed claims 1-3, 4-5, 8, 10-11, 13-17 and 19 of the '611 Patent through the importation into the US, sale for importation into the US, and/or sale in the US after importation of the Glide Zone Rocker Chair.

### C. General Overview of GCI's Patented Technology

The technology at issue in this Action involves collapsible and portable rocking chairs. Two examples of portable chairs are described in the asserted '611 Patent: "director's style" chairs, which fold in at least a side-to-side manner, and "front fold" chairs, which fold at least in a front-to-back manner. Figure 2 of the asserted '611 Patent depicts an example of a "director's style" chair, while Figure 9 depicts an example of a "front fold" chair:







Thus, the asserted ‘611 Patent relates to different types of improved collapsible and portable rocking chairs. For example, the patent describes outdoor rocking chairs that are lightweight and easy to manipulate to and from a collapsed position (for easy carrying) and a set-up position (for use). The patent improves upon existing products at the time by providing a design with enhanced safety, a more-stable rocking feature, and other benefits.

**D. <u>The Asserted ‘611 Patent</u>**

The asserted ‘611 Patent, entitled “Collapsible and Portable Rocking Chair,” issued on June 23, 2015, from an application filed on October 7, 2013, and lists Daniel R. Grace as the sole inventor. *See* Exh. A (‘611 Patent). The ‘611 Patent claims priority to a provisional application filed October 5, 2012.

The ‘611 Patent describes “improvements in rocking chairs that are foldable and unfoldable.” Exh. A (‘611 Patent) at 1:13-17. In particular, the ‘611 Patent describes improvements to both comfort and use, which were lacking in prior products. *Id.* at 1:33-36, 1:39-42, 2:19-22. The ‘611 Patent also recognized that the design and construction of prior portable chairs rendered them incapable of rocking reliably and securely. *Id.* at 2:22-25. Previously, when components were added that allowed a portable chair to rock, these additions hindered the chair’s ability to be easily foldable or increased its weight so as to make transporting the chair cumbersome. *Id.* at 2:25-28.

The ‘611 Patent also describes how the construction of conventional rocking chairs made them ill-suited to use outdoors. For example, the ‘611 Patent explains that the use of arched rails in outdoor rocking chairs resulted in there being only a single contact point with the ground. *Id.* at 2:28-34. This single contact point on each rail caused an “increased risk that one or both sides of the chair will sink into [the ground] or get bogged down.” *Id.* at 2:32-38.

Against this backdrop, inventor Daniel Grace set out to improve upon the inferior designs available at the time. Mr. Grace’s efforts resulted in the ‘611 Patent, which describes his solutions to the problems of the prior art.

One unique feature of GCI’s patent is a “rocker mechanism” that facilitates stable rocking of the chair. In one embodiment, shown in Figure 6 (reproduced below), a rocker mechanism 32 includes a spring 46 and a tubular member 38 both disposed within a sleeve 44. *Id.* at 7:42-51. In such an embodiment, the chair rocks by pivoting on fulcrum 54, *id.* at 7:65-8:2, as shown in Figure 3, in combination with the action of the rocker mechanism. As so designed, the rocker mechanism prevents the chair from tipping and adds stability to the chair while rocking, without compromising the facility in collapsing and transporting the chair. *Id.* at 8:9-12.



FIG. 6

In use, when a user shifts her weight backward, a tubular member 38 slides downward within a sleeve 44 against the force of a spring 46. *Id.* at 8:9-12. Additionally, the spring 46, when compressed, biases the tubular member 38 in the opposite direction – i.e., upwards out of the sleeve 44 and upwards and forwards relative to the rear of the rocker mechanism 32 and aids in forward rocking movement of the chair. *Id.* at 8:12-18. Further, when the user shifts her weight forward, the tubular member 38 slides upward within the sleeve 44 and pulls against the force of the spring 46, which will bias the tubular member 38 back within the sleeve 44.

The ‘611 Patent also describes other examples of a “rocker mechanism.” *Id.* at 3:55-4:11, 7:42-64, 11:16-32, 11:55-12:27. For example, the “rocker mechanism” can comprise torsion springs instead of compression springs. In one example, torsion springs may be provided on the lower portion of each frame side member assembly, such as at the fulcrum point of each frame side assembly on a support runner. *Id.* at 11:21-25. Still further, “rocker mechanisms” can be provided on or relative to the rear legs of the chair, the front legs of the chair, or both rear and front legs of the chair. *See, e.g., id.* at 4:1-11; 11:25-32; 12:24-27; FIG. 9.

The ‘611 Patent additionally describes a chair that is collapsible, and likewise, easy to set-up for use. For example, in one embodiment, the chair moves from a “set-up” position (as shown in Figure 2) to a “collapsed” position (as shown in Figure 7) by folding cross members 56 inwardly, pivoting the cross members 56 about pivot points 64 and 66. *Id.* at 9:1-11, 12:28-36. In the “director’s style” form of the chairs (FIG. 2), the cross member assemblies are interconnected between the sides of the chair frame and movement of the cross members relative to each other pulls and pushes the sides of the chair frame between set-up and collapsed conditions. Likewise, transverse movement of the sides of the chair frame can effect pivoting movement of the cross members relative to the chair frame and one another. *See id.* at 8:38-49 &

8:56-9:11, FIGS. 2, 7. These cross members facilitate easy folding of the chair and support it by balancing and redistributing the forces on frame 12. *Id.* at 9:12-16.

These and other features of the chairs described in the '611 Patent solved the problems that Mr. Grace identified in the prior art.

### E. The Level of Ordinary Skill in the Art

GCI assets that the level of ordinary skill in the art for the '611 Patent is a bachelor's degree in mechanical engineering or a similar field, along with at least two years of experience in the furniture industry. Additional education might substitute for less experience in the field, while additional experience might serve as a substitute for less formal education.

## III. LEGAL STANDARDS

The "construction of a patent, including terms of art within its claim(s), is exclusively within the province of the court." Markman v. Westview Instruments, 517 U.S. 370, 372 (1996). Thus, "in construing a patent claim, [a judge] is engaged in much the same task as the judge would be in construing other written instruments, such as deeds, contracts, or tariffs." Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 833 (2015) (citing Markman, 517 U.S. at 384, 386, 388, 389).

"It is bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Philips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). For this reason, "a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004) (quoting 35 U.S.C. § 112, ¶ 2). Claim language usage and

its context within the claim itself is the most important indication of the meaning" of a disputed claim term. Middleton, Inc. v. Minnesota Mining & Manufacturing Co., 311 F.3d 1384, 1387 (Fed. Cir. 2002). Thus, "the context in which a term is used in the asserted claim can be highly instructive," as can "[o]ther claims of the patent in question." Phillips, 415 F.3d at 1314.

"[T]he words of a claim are generally given their ordinary and customary meaning … [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Id. at 1312-13 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314. As the Federal Circuit has alternatively put it, "[i]f the claim term has a plain and ordinary meaning, our inquiry ends." Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc., 711 F.3d 1348, 1361 (Fed. Cir. 2013). Where additional analysis is necessary, the intrinsic record – consisting of the patent's claims, the patent specification (or body of the patent), and the prosecution history of the patent – is "the primary tool to supply the context for interpretation of disputed claim terms." Nazomi Comm., Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1368 (Fed. Cir. 2005).

There are two exceptions to the general rule in favor of plain meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Thorner v. Sony Comput. Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Patents serve a public notice function. Because of this and absent the two scenarios discussed above (i.e., acting as lexicographer or disclaimer), it is "unjust to the public, as well as an evasion of the law,

to construe it in a manner different from the plain import of its terms." Philips, 415 F.3d at 1312 (quoting Toshiba Corp. v. Imation Corp., 681 F.3d 1358, 1369 (Fed. Cir. 2012) ("Absent disclaimer or lexicography, the plain meaning of the claims controls.")). As such, courts require a clear and explicit statement by the patentee to satisfy the requirements for either the disclaimer or lexicography exceptions. Thorner, 669 F.3d at 1362. Indeed, to act as a lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" in the patent's intrinsic record (i.e., the specification or the prosecution history). CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002).

Absent the above exceptions, terms are construed according to their plain and ordinary meaning, and the "[t]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." Phillips, 415 F.3d at 1321 (internal quotation marks omitted); see also Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) (the person of ordinary skill is required to "read the claim term not only in the context of the particular claim … but in the context of the entire patent, including the specification.") (internal citations omitted). Nevertheless, the claims of a patent do not stand alone, but rather "are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." Phillips, 415 F.3d at 1315 (internal quotation and citations omitted). Thus, "claims must be read in view of the specification, of which they are a part." Id. (internal quotation and citation omitted). There is a distinction, however, "between using the specification to interpret the meaning of a claim," which is proper, "and importing limitations from the specification into the claim," which is improper. Id. at 1323. Indeed, the specification "cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own

lexicographer or intentionally disclaimed or disavowed claim scope." Aventis Pharm. Inc. v. Amino Chemicals Ltd., 715 F.3d 1363, 1373 (Fed. Cir. 2013).

Finally, "extrinsic evidence" (i.e., expert testimony, dictionaries and learned treatises) may also be considered, but only so long as that evidence does not contradict the meaning of claim terms indicated by the intrinsic record. See Phillips, 415 F.3d at 1317-18. The Federal Circuit has cautioned that unsupported assertions by experts "are not useful." Id. at 1318; see also Immunex Corp. v. Sanofi-Aventis U.S., LLC, 977 F.3d 1212, 1221 (Fed Cir 2020) ("While extrinsic evidence may sometimes illuminate a well-understood technical meaning, … that does not mean that litigants can introduce ambiguity in a way that disregards language used in the patent itself."). Additionally, extrinsic evidence of any kind – including expert testimony and dictionary definitions – may not be used "to contradict claim meaning that is unambiguous in light of the intrinsic evidence." Wi-Lan, Inc. v. Apple, Inc., 811 F.3d 455, 462 (Fed. Cir. 2016) (internal quotation omitted); see also CAE Screenplates v. Heinrich Fiedler GmbH, 224 F.3d 1308, 1318 (Fed. Cir. 2000) ("[W]hen the intrinsic evidence is unambiguous, it is improper for a court to rely on extrinsic evidence such as expert testimony when construing disputed claim limitations."); Uniloc 2017 LLC v. Apple Inc., 996 F.3d 1368, 1374-75 (Fed. Cir. 2021) (confirming that intrinsic evidence – namely, the claim language, specification, drawings, and prosecution history – outweigh dictionary definitions).

Additionally, a claim limitation may be construed as a "means-plus-function" limitation pursuant to 35 U.S.C. § 112(f). Section 112(f) (formerly 35 U.S.C. § 112, sixth paragraph) states in pertinent part that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

When a claim limitation is deemed to invoke means-plus-function, the limitation is interpreted to cover all corresponding structure disclosed in the specification in a way that one skilled in the art will understand what structure will perform the recited function, as well as equivalents. See Atmel Corp. v. Information Storage Devices, Inc., 198 F.3d 1374, 1381 (Fed. Cir. 1999).

A three-part test for identifying a "means-plus-function" limitation is set forth in MPEP § 2181(I):

1. The claim limitation uses the term "means," "step," or other term that is a generic placeholder for performing the claimed function;

2. The term "means," "step," or other generic placeholder is modified by functional language, often (but not always) linked by a transition word (e.g., "for") or phrase (e.g., "configured to" or "so that"); and

3. The term "means," "step," or other generic placeholder is not modified by sufficient structure, material, or acts for performing the claimed function.

Within the context of these basics of patent claim construction, Plaintiff GCI presents its proposed construction of disputed terms from the '611 Patent below.

## IV. GCI's PROPOSED CLAIM CONSTRUCTION OF DISPUTED TERMS

The Parties dispute the construction of several terms. The present brief addresses two terms from the Asserted Claims: "rocker mechanism" and "sleeve".

GCI's proposed constructions for these terms comport with a POSITA's understanding of the plain meaning in light of the specification. These constructions should be adopted.

### A. “rocker mechanism” (claims 1 and 15)

| GCI’s Proposed Construction |
| --- |
| “a mechanism to aid the rocking movement of a chair frame”<br>GCI asserts that this term should be construed as a “means-plus-function” limitation pursuant to 35 U.S.C. § 112(f): The function is identified in claims 1 and 15 as “for supporting the chair during movement of the chair frame between said forward and rearward positions.” Corresponding means are described in the specification as set forth in 3:55-67; 4:1-11; 6:56-64; 7:42-64; 11:16-32; 11:55 to 12:27; FIGS. 2, 6 & 9. |

GCI asserts that this term should be construed as a “means-plus-function” limitation pursuant to 35 U.S.C. § 112(f). For example, in the context of Asserted Claim 1, the limitation is recited as follows:

> At least one ***rocker mechanism*** attached to the chair frame for supporting the chair during movement of the chair frame between said forward and rearward positions.

While the limitation does not use the traditional terms “means” or “step”, it does use the term “mechanism” which is a generic structural placeholder for performing the recited function – namely, “for supporting the chair during movement of the chair frame between said forward and rearward positions.” Importantly, the “rocker mechanism” phrase is not modified within claim 1 (or claim 15) by sufficient structure for performing the recited function. Indeed, dependent claim 4 includes additional recitations adding such structure for performing the recited function:

> The collapsible and portable rocking chair … wherein said rocker mechanism comprises a tubular extension member projecting outwardly and downwardly from the rear of at least one of the frame side assemblies and received within a sleeve housing a spring to which the tubular member is attached.

Thus, “rocker mechanism” is a means-plus-function limitation that should be construed in accordance with Section 112(f) to cover all corresponding structure disclosed in the ‘611 Patent specification for performing the recited function. See Atmel, 198 F.3d at 1381. Moreover, it is clear that the construction of “rocker mechanism” in claim 1 is broader than the specific structure

recited in claim 4, covering all embodiments disclosed in the '611 Patent, and equivalents. Under the doctrine of claim differentiation, an independent claim is presumed to have a broader scope than a dependent claim to avoid rendering the dependent claim redundant. See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc., 239 F.3d 1225, 1234 (Fed. Cir. 2001) (while interpreting means-plus-function limitation, noting "the doctrine of claim differentiation indicates that these [independent and dependent] claims are presumptively different in scope" and concluding independent claim 1 was broader than dependent claim 3).

Proper determination of "corresponding structure" requires the Court to look to the entire specification and include all structures disclosed for the means-plus-function term at issue, including equivalents. Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1379 (Fed. Cir. 2001) ("The specification must be read as a whole to determine the structure capable of performing the claimed function."). "When multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 - generally reads the claim element to embrace each of those embodiments." Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999).

GCI concedes that a preferred embodiment of a "rocker mechanism" in accordance with the claimed invention is illustrated in FIG. 6 of the '611 Patent. However, that embodiment is not the only embodiment disclosing structure corresponding to the rocker mechanism. As stated during the discussion of FIG. 6, "the rocker mechanism 32 can take a variety of forms without departing from the spirit and principles of the present invention." Exh. A ('611 Patent) at 11:16-18.

Indeed, the specification describes a variety of possible structures of the rocker mechanism. *Id.* at 3:55-67 (describing a "rocker mechanism comprising a tubular extension

member projecting outwardly and downwardly from the rear of the frame side assemblies and received within a sleeve housing a compression spring to which the tubular extension member is attached"), 4:1-11 (disclosing alternate embodiments in which the rocker mechanism may be provided (i) in connection with the front leg member, either together with or in lieu of a rear rocker mechanism; (ii) in connection with both the front and rear leg members on each side of the chair frame, each positioned about a fulcrum point; or (iii) as "a torsion spring operatively associated with the fulcrum point of each frame side assembly"), 7:42-64 (detailing the structure of alternate designs of a rocker mechanism that "can comprise an axially-elongated tubular member 38 pivotally attached at a first end via a pivot joint 40 and pivot pin 42 to the rear leg portion 28 of the frame loop"), 11:55-12:27 (describing the structure of the "built in rocker mechanism" included on the front and rear legs of the chair shown in Figure 9), 6:56-64, Fig. 2. Because all of these embodiments describe structure corresponding to the rocker mechanism, any construction that does not account for them is necessarily incorrect. See Callicrate v. Wadsworth Mfg., Inc., 427 F.3d 1361, 1369 (Fed. Cir. 2005) (district court erred by not accounting for all embodiments of structure in the specification corresponding to the claimed "cutting means").

Accordingly, the Court should construe the structure corresponding to the claimed "rocker mechanism" to include the following portions of the specification: 3:55-4:11, 6:56-64, 7:42-64, 11:17-32, 11:55-12:27, and FIGS. 2, 6, and 9.

**B. "*a sleeve*" (claims 4-5 and 16-17)**

| GCI's Proposed Construction |
| --- |
| "a part designed to fit over or internally receive another part" |

GCI asserts that this term should be construed pursuant to its plain and ordinary meaning – namely, "a part designed to fit over or internally receive another part". This term is not a technical term or term of the art with a special meaning in this or any other field. Under these circumstances, Federal Circuit law dictates that there is no need to construe this term beyond its plain and ordinary meaning, just as GCI proposes.

It would be improper to restrict the construction of this term to any particular embodiment selected for illustrated and description in the '611 Patent. Aventis Pharm., 715 F.3d at 1373 ("[The specification] cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope."). For example, a "sleeve" in accordance with its plain and ordinary meaning, cannot be restricted merely to a tubular construction, as illustrated in the embodiment of FIGS. 2-7 and 9, especially since the particular shape or structure of the "sleeve" is not critical to the claimed invention so long as it is capable of receiving a tubular member and housing a spring, as recited. *See, e.g.*, Exh. A ('611 Patent), claim 4 ("wherein said rocker mechanism comprises a tubular extension member … received within a sleeve housing a spring to which the tubular extension member is attached."). Indeed, the claimed "sleeve" is not described in any structurally limiting way in the description provided. *See also id.* at 11:16-18 ("[T]he rocker mechanism 32 can take a variety of forms without departing from the spirit or principles of the

present invention."; 11:18-24 (discussing alternate design replacing compression spring 46 with torsion spring).

In the '611 Patent, a sleeve 44 is shown and described in connection with housing a spring 46 and for receiving a tubular member 38 attached to the spring 46. *See id.* at 7:42-48; *see also* FIG. 6. Notably, in the '611 Patent, while the member 38 received within the sleeve 44 is described and claimed as being "tubular", the sleeve 44 is never described in that fashion. This, the inventor clearly never intended the "sleeve" to be so limited.

In the embodiment of FIG. 9, sleeves 144 are illustrated and described as being a "tube". *See, e.g., id.* at 11:55-60. This alternate design is particular to the embodiment of FIG. 9, where the "rocker mechanisms" are designed to be extensions of each of the chair legs. *See id.* at 11:60-12:23; FIG. 9. Notably, the same descriptive language is <u>not</u> used in connection with the embodiment shown in FIG. 6. Thus, the sleeve could be tubular, tube-like, or have a different structural shape to accommodate a tubular member and a spring without deviating from the inventor's intent for the invention. If anything, the critical structure is the interior spacing to be able to accommodate a tubular member and a spring, such as shown in FIG. 6.

The widely-understood meaning of the term "sleeve" is also not limited to a tubular construction. In fact, according to Webster's Dictionary, a "sleeve" is understood to be **<u>either</u>** "a tubular part (such as a hollow axle or a bushing) designed to fit over another part" **<u>or</u>** "an open-ended <u>flat or tubular</u> packaging or cover". *See merriam-webster.com/dictionary/sleeve* (emphasis added). Additional dictionary definitions are similarly broad and not limited just to a tubular construction.

**Learner's Dictionary** (*learnersdictionary.com/definition/sleeve*)

> "a part that fits over or around something to protect it or to hold its parts together"; "[Example] The joint is covered with a metal *sleeve*."

**Dictionary.com** (*dictionary.com/browse/sleeve*)

> "a protective container, usually thin and flexible with an opening on one side for insertion or removal of an item, as a paper storage envelope for a phonograph record, or a padded case for a tablet or other electronic device"; "a pliable tubular or rectangular container for crackers, cookies, and the like that is typically opened at one end to remove individual servings"; "a tubular piece, as of metal, fitting over a rod or the like"

**Collins Dictionary** (*collinsdictionary.com/us/dictionary/english/sleeve*)

> "a tube or tubelike part fitting over or around another part"; "a thin paper or plastic cover for protecting a phonograph record, usually within a jacket"

**Wiktionary** (*en.wiktionary.org/wiki/sleeve*)

> "A (usually tubular) covering or lining to protect a piece of machinery etc."

As noted, the inventor did not act as his own lexicographer and redefine the term "sleeve" to any particular narrow or hyper-specific meaning. Nor was the term narrowed in any way during prosecution of the Asserted Claims. Instead, the intended, plain and ordinary meaning of "sleeve" is perfectly clear and straightforward. The specification and drawings are likewise clear in support of such a construction.

As a result, in order to maintain the clarity of the language that the inventor selected to employ in the '611 Patent, the Court should adopt GCI's proposed construction and give the term

"sleeve" its plain and ordinary meaning – namely, "a part designed to fit over or internally receive another part".

## V. CONCLUSION

For all of the foregoing reasons, Plaintiff GCI respectfully requests that the Court adopt GCI's proposed constructions, and grant such further relief as it deems just and proper.

Respectfully submitted,

Plaintiff GCI Outdoor, Inc.

Dated: November 18, 2021

/s/ Wm. Tucker Griffith

Wm. Tucker Griffith
*Tucker.griffith@lathropgpm.com*
Lathrop GPM LLP
28 State Street
Boston, Massachusetts 02109
Tel.: (857) 300-4044

Thomas E. Bejin (Mich. P56854)
*bejin@b2iplaw.com*
David W. Hannon (Mich. P68968)
*hannon@b2iplaw.com*
BEJIN BIENEMAN PLC
2000 Town Center, Suite 800
Southfield, MI 48075
Tel.: (313) 528-4882
Fax: (313) 528-6923

Attorneys for Plaintiff GCI Outdoor, Inc.

# Certificate of Service

I hereby certify that on the 18th day of November 2021, a true copy of the foregoing **PLAINTIFF GCI OUTDOOR, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/ Wm. Tucker Griffith
Wm. Tucker Griffith